IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No: 1:19CR00057 |
| : | |
| RICHARD PAK, : | The Hon. Liam O'Grady |
| Defendant. : | |

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

COMES NOW the defendant, Richard Pak, by and through counsel, and provides this Court with his position regarding his advisory sentencing guidelines range and the sentencing factors espoused in 18 U.S.C. § 3553(a). The Supreme Court's decision in *United States v. Booker,* 125 S. Ct. 738 (2005) and its progeny require district courts to consider all the factors contained in § 3553(a) when calculating a criminal defendant's ultimate sentence. This motion presents the defendant's position on sentencing as it relates to the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors enunciated in 18 U.S.C. § 3553(a).

In consideration of Mr. Pak's advisory sentencing guidelines range and the factors set forth in Section 3553(a), Mr. Pak respectfully submits that a sentence of 144 months would best serve the interests of justice without being excessive.

### FACTUAL BACKGROUND

Mr. Pak was arrested in this case on May 9, 2019. He has been held in federal custody since that time. PSR ¶ 4. On November 6, 2019, both Richard Pak and his brother Spencer

1

entered guilty pleas in the above-captioned case.[1] Richard plead guilty to a total of four counts: i) Conspiracy to Distribute Controlled Substances, including at least 500 Grams or More of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846;[2] ii) Distribution of Cocaine, in violation of 21 U.S.C. § 841(a)(1);[3] iii) Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A);[4] and iv) Providing False Statements During the Purchase of a Firearm, in violation of 18 U.S.C. § 924(a)(1)(A).[5] His sentencing was originally scheduled for March of 2020, however due to the COVID-19 pandemic and issues related to his former defense counsel, the sentencing hearing was ultimately continued to September 8, 2022.

## ARGUMENT

**I)   ADVISORY SENTENCING RANGE**

Mr. Pak agrees that the PSR writer correctly calculated his guidelines. His total offense level for the three offenses that group together is 31; his criminal history category is I. This corresponds to an advisory sentencing range of 108–135 months. With respect to the 924(c) count, the guideline sentence is the minimum term of imprisonment required by statute, which in this case is 60 months.

**II)   3553(A) FACTORS**

### HISTORY AND CHARACTERISTICS OF THE DEFENDANT

---

[1] Although his plea hearing did not take place until November 6, 2019, Richard Pak signed his plea agreement as early as October 9, 2019.  *See* Dkt 224.

[2] This charge was the subject of a one-count criminal information.

[3] Count 12 of the third superseding indictment.

[4] Count 23 of the third superseding indictment.

[5] Count 27 of the third superseding indictment.

Richard Pak's formative childhood years were tumultuous. His father was an abusive alcoholic who was prone to violence when he drank. As Richard's mother explains "alcohol would take it to another level."[6] The violent outbursts were primarily directed at Richard's mother, but Richard, too, suffered physical abuse at the hands of his father. Richard was six years old the first time he remembers that police were called to his home to stop his father from beating his mother. PSR ¶ 144. It was not the first instance of abuse; it was simply bad enough to arouse the attention of neighbors, who called police. PSR ¶ 144. On that occasion, Richard's father caught his mother outside, trying to leave, and he "dragged [her] all over the floor, beating [her]."[7] He was charged criminally for the abuse, but the case was ultimately dismissed because his mother was too scared to pursue the prosecution. *Id.* Around this time, Richard's younger brother, Spencer, was born. Spencer's birth, however, did little to temper the frequency of the abuse in the household. As Richard's mother explains "police got called to the house so often that it became normal for my kids and I."[8] The final straw for Richard's mom was when she "took my kids out for some fun and my ex-husband was waiting for us outside, he smashed the car window where Richard and Spencer was sitting, not caring he could of hurt them, eventually I went home and he tied me up and threaten [sic] to beat me up till I am dead with a baseball [bat]."[9] Richard's father was criminally charged with domestic abuse on three separate occasions before his mother gained the fortitude to leave. PSR ¶ 144. However, because she had no means to support her two children at the time, Richard and Spencer remained with their alcoholic father

---

[6] PSR p. 40.

[7] *Id.*

[8] *Id.*

[9] *Id.*

3

after their mom left. In her letter to the Court, Richard's mother reflects on her decision to leave her children with their father:

> when my children's father and I divorced, both Richard and Spencer stayed with their father. As much as I wanted to have my children with me, I was at that time a housewife, with no means to support a family on my own. … It pains me every hour of the day to see my children in their current situation. I reflect on the many "what ifs" that occupy my mind constantly. What if I was able to take my children in when they were younger? What if I had known sooner the pain that they were going through as young children? These thoughts plague me daily.[10]

When his mom left, Richard was approximately 12 years old. His younger brother was 6. Spencer describes his limited memory of this time in his letter to the Court:

> growing up my parents divorced, so my brother was always there for me. I was young at the time, so I didn't understand and feel as much, but I know that took a toll on my big brother as well because my father used to physically and mentally abuse my mother and brother until the point that we all ended up leaving my father.[11]

Richard's description of that time paints a stark contrast to his brother's experience:

> After my mom left everything changed. My father's drinking and abuse got worse. A lot of times he took it out on me. Eventually I started trying my best to avoid my dad by staying outside after school and on weekends with my little brother and trying to stay in my room or basement when I was at home. The kitchen / living room was like a drinking area. There would always be a big pile of empty beer cans or alcohol bottles. I remember a lot of times there would be little to no food at home so my brother and I would have to wait to eat at school or sometimes get lucky and go to a friends' house.
>
> One night that stands out to me and I feel affected my choices growing up was the night I woke up to the sound of my brother crying. When I asked him what was wrong, he told me he was hungry and that his stomach hurt. We lived across the street from a shopping center at the time so I snuck out and went to a store trying to steal some chicken and potato wedges and a soda but I got caught trying to leave. I still remember how embarrassed I was. It was my first time getting in trouble. I was only in 6th or 7th grade. The loss prevention officer asked me for my parents number but I didn't know where my mom was at the time and my dad was still drunk at home. I thought he would probably kill me or not even come if they called him so I didn't say a word. I kept my head down the whole time. He thought I didn't

---

[10] Letter of Yujin Park.

[11] Letter of Spencer Pak.

4

even speak English. Then someone else came in the room and asked me if I was hungry and if that's why I was trying to steal the food. I told him what was going on and that I was trying to get home to my brother. He bought me a bunch of food and gave me a ride home. On the ride home he made me promise not to steal from that store again. When I snuck back in the house my dad was passed out in the kitchen and my little brother was asleep. I woke my brother up and showed him what I got. Chicken is his favorite. I still remember his face when he smiled and how happy we were eating it. All the embarrassment and thinking I was going to jail was worth it. After we ate, I found the receipt. It was like $18 and change and I remember thinking that night, and for a while after, that I needed to figure out how to start making some money.[12]

Though just 12 years old, Richard was thrust into a position of being the de facto head of the household, while still processing his own feelings of abandonment. He took on the burden of providing for and protecting not just himself, but his younger brother as well. In his thoughtful letter to the Court, Richard's stepfather addressees this:

I could see how much pain Richard had in his heart. All the unbearable burden and pain at a young age; the feeling that he is the head of the household and needs to protect his mom and younger brother; and the memory of being abandoned — these pains and difficulties made him choose the wrong path.[13]

During this time, while living with his father, Richard started to get into trouble. He stayed out late with friends, avoided returning home at all costs, began drinking and using drugs, and started getting into fights. From there, the first iterations of the gang were formed. Richard explains:

We stated getting into a lot of trouble and fights. It got to the point where other Asian kids in school and the neighborhood would come to us if they were getting picked on and sometimes we helped. It made me feel good about myself. I knew what it was like to be picked on for being asian … I grew up feeling helpless. I felt like I failed my mom … I felt like I was supposed to help her but I was too scared. I wanted to be like the superheros I watched on tv growing up … but I was too powerless to even stop my dad from beating my mom. That affected me. But when I hung out on the streets with my

---

[12] Letter from Richard Pak.

[13] Letter from Youngho Park.

friends it made me feel like a superhero. I would take my anger from home and take it to the streets.

Eventually Richard's mom was able to bring Richard and Spencer into her home, but by then Richard was in 12th grade. By that time, Spencer could tell that his older brother was going down a bad path. "I felt as if it was too late for my brother now being around the wrong crowd and influences, by not having enough guidance from a proper father." Over time, Spencer followed suit. One of Richard's greatest regrets is allowing his brother to join the gang. For a long time, Richard tried to dissuade his younger brother from joining. Spencer explains:

> My brother was my father figure while I was growing up before my step father. He always did and tried to keep me out of trouble but everyone makes their own choices when growing up. He's the type of brother who made me take school seriously, try hard, appreciate life and always listen to my mother with respect. He never wanted me to be part of the gang and didn't let me at first. But I always wanted to be a part of it seeing everyone and everything thinking it was cool, so I persisted to him for years until he agreed.[14]

Although the gang was a pivotal part of Richard's life for many years, his mother (2nd to R below), step-father (far R below) and grandmother are a positive, counter-balancing influence for him. His love, respect and unflinching devotion for his family is one of Richard's most admirable qualities. To this day, he speaks to his mother and grandmother on a daily

---

[14] Letter from Spencer Pak.

6

basis.[15] The letters written to the Court on Richard's behalf offer further evidence of Richard's devotion to his family, and other redeeming characteristics, and reaffirm that, if given the chance, Richard has the ability to change the direction of his life.

Ms. Katelin Han, a Fairfax County school educator and lifelong family friend, whom Richard considers as his aunt, writes:

> [h]e may have gotten into trouble with the law … but I also know the side of Richard with a caring heart. At any large family/friend gatherings, Richard always showed respect to the elders, helped his mom, and exhibited care. …Richard is also a good son, who took pride in caring for his mom. He never forgot how his dad abused his mom and has been very protective of her after their divorce.[16]

Other letters echo this same sentiment of Richard's devotion to his family, and even to his beloved dog, Peanut. Still other letters, such as the letter written by realtor Badar Zaman, touch on Richard's potential for future employment:

> Richard was always there to help me with language interpretation for my Korean clients. He expressed great interest in learning about short sales and was taking real estate classes to further his knowledge… He has proven to be dependable and consistent, never expecting anything in return.

Richard's work experiences with Mr. Zaman are attributable to his mother's positive influence on him. In response to his mother's encouragement, Richard studied for and obtained his GED. She also motivated him to study for his real estate license. To Richard's credit, he dedicated his time to studying for the exam and passed the first test prior to his arrest in this case.[17] He has not successfully completed the second test, but he hopes one day to pursue a career in the field of real estate. Additionally, Richard's mom has her own business assisting individuals with loan

---

[15] *See* Letters from Yujin Park and Chong Jan.

[16] *See* letter from Hamelin Han.

[17] *See* Long & Foster recruitment letter.

7

modifications, debt consolidation and credit repair. Before his arrest, Richard served as a quasi-apprentice in his mom's office, performing administrative tasks, assisting with translation, and learning the business. Throughout his incarceration, Richard has continued to learn about his mother's business by reading educational materials and engaging in discussions with her. As to his prospects for the future, Richard's mother puts it best in her letter when she writes "[t]here is a long and tough road ahead, but it is a burden that we are willing to take on as a family."



photo of Richard, his grandmother, and dog Peanut

8

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Reccless Tigers developed locally from a number of predominately Asian gangs operating in northern Virginia as well as from its association with a Los Angeles, California, street gang known as the Asian Boyz. PSR¶ 41, 43. Richard Pak was a leader of the predecessor gangs Young Korean Loks and the Korean Dragon Crew. PSR¶ 42. Eventually he became associated with the Reccless Tigers, and he, together with Tony Le and Kyu Wa ("Alex") Hong, were the leaders of the Reccless Tigers. *Id.* Over time, different branches or offshoots of the Reccless Tigers gang were formed, including Tigerside, Club Tiger, and Lady Tigers. Each of the offshoots were loosely organized, with their own members and hierarchy.

The primary source of revenue for the Reccless Tigers was drug distribution. PSR ¶45. Marijuana and THC products were the most profitable drug trafficking activity for the Reccless Tigers, though several members, including Richard, sold cocaine in addition to Marijuana. *Id.*

During the course of the conspiracy, Richard Pak acquired cocaine from other gang members, including Peter Le, in multi-ounce quantities, which he then distributed in multi-ounce, ounce and lesser amounts. SOF ¶7, 22. Pak sent other individuals associated with the gang to make narcotic deliveries on his behalf. PSR ¶53. He also regularly obtained marijuana in pound and multi-pound quantities, which he then distributed in various quantities. He further sold TCH oil, vape pens containing THC oil, edibles, and other THC-based products. SOF ¶5. On November 18, 2018, Pak agreed to give an individual marijuana in exchange for purchasing two firearms for Pak. PSR ¶60.

During the course of the conspiracy, Mr. Pak and other gang members used violence and threats of violence to intimidate their customers, rival drug dealers and other gangs and to collect

9

drug debts. SOF ¶23. Mr. Pak did not participate in the kidnapping or murder of Brandon White, nor was he involved in the planning of the crime.

### THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT AND PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. PAK

A sentence of 144 months would appropriately reflect the seriousness of Richard's crimes and promote respect for the law. It is a significant sentence — one that is substantially above the mandatory minimum — but not so excessive as to be counterproductive to his ability to successfully transition back to his family and the community upon his release.

Before this case, Mr. Pak had never been sentenced to jail or prison. He has now been incarcerated for over three years, serving the majority of that time at Northern Neck Regional Jail, where he has been routinely subjected to threats as a result of his decision to plead guilty. Further, in addition to expressing remorse and accepting responsibility for his own crimes, Mr. Pak encouraged his brother to do the same. In fact, his brother plead guilty on the very same day. Richard and his brother were among the first defendants to plead guilty. Finally, despite his crimes, Richard retains the love and support of his close-knit family (his mother, grandmother and step-father), who are committed to helping him succeed upon his release.

### THE NEED TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER

Mr. Pak has a family history of serious medical conditions. His mother has Diabetes and recently had to undergo kidney transplant surgery due to complications with her disease. PSR p.41. Mr. Pak also suffers from a number of serious medical conditions, including Diabetes, Hypertension (high blood pressure), ventricular hypertrophy, ventricular enlargement and atrial

enlargement. *See* Exhibit - medical records. He requires regular medical care including multiple blood-sugar checks, insulin injections and several other daily prescription medications. Prior to his arrest, he was under the care of an endocrinologist and cardiologist. *Id.* His incarceration has had a deleterious effect on his physical health, as evidenced by the fact that he has had be transported to the hospital on multiple occasions due to swollen limbs and other symptoms related to his Diabetes.

Mr. Pak is bilingual, has his GED and previously passed the first of two exams towards obtaining his real estate license. He has the capability to pursue a career in the field of real estate, and/or with his mother's business in the field of debt consolidation, upon his release. He is not in need of vocational services. However, he would benefit from drug treatment and has indicated a willingness to do so.

## THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

The Reccless Tigers investigation and prosecution has involved many criminal co-conspirators. As the government has explained in prior pleadings, the defendants who have plead guilty and been previously sentenced by this Court fall into three categories: (1) the lower-level defendants whose participation in the gang and/or drug conspiracy was limited (sentenced to less than 60 months); (2) defendants who were heavily involved in narcotics trafficking, gun possession, and some acts of violence (sentenced to 120 months -135 months); and (3) defendants who were responsible for or involved in the kidnapping and murder of Brandon White (sentenced to 171 months and above). The chart below lists each of the defendants who has plead guilty and been sentenced to date. It is arranged in chronological order, by date of

11

guilty plea. A sentence of 144 months for Richard Pak would avoid unwarranted disparity with similarly situated defendants by placing him at the top range of the second category of defendants — those who were heavily involved in narcotics trafficking, gun possession, and some acts of violence — while distinguishing him from the defendants who were involved in the kidnapping and murder of Brandon White, which Richard was not involved in.

| NAME | Guilty Plea Date | Crimes of Conviction | USSG | Date & Sentence of incarceration |
|---|---|---|---|---|
| Brandon Sobotta | 5/21/19 | i) distribution of cocaine | 15-21 mos | 9/13/19 sentenced to **time served** |
| Zu Hun Chang | 7/12/19 | i) PWID cocaine | 57-71 mos | 11/1/19 sentenced to **42 months** |

| Dane Hughes | 9/3/2019 | i)conspiracy to distribute 100 Kg or > of mj; cocaine, THC, Xanax; ii) conspiracy to maintain place for the purpose of distributing CDS; distribute CDS to persons under 21; distribute CDS within 1000 feet of school; entice persons under 18 to violate Title 2; sell drug paraphernalia and use the mail to transport drug paraphernalia; renting and maintaining a place for purpose of distributing marijuana | TBD | TBD |
|---|---|---|---|---|
| Bradley Sullivan | 9/23/19 | i) conspiracy to distrib. 100 kg or more of marijuana | TBD | TBD |
| Richard Pak | 11/6/19 | i) Conspiracy to distrib. 500 gm or > of Cocaine; ii) Distrib. Cocaine, iii) § 924(c); iv) False Statements During the Purchase of a Firearm | TBD | TBD |

| Spencer Pak | 11/6/19 | i) distribution of cocaine; ii) conspiracy to distribute 500g or > cocaine; iii) 924(c) | USSG adjusted to mandatory minimum 120 mos | 1/12/21 sentenced to **120 months** mandatory minimum |
| --- | --- | --- | --- | --- |
| Angel Hoang Le | 12/5/19 | Maintaining a premises for purpose of manufacturing/ distributing CDS | 57-71 mos | 11/10/20 sentenced to **42 months** |
| Joshua Miliaresis | 12/17/19 | i) conspiracy to distribute 1000 or > Mj plants | TBD | TBD |
| Tyler Thang Le | 1/6/20 | i) conspiracy to distrib. 1000 or . Marijuana plants | 135-168 mos | 10/28/20 sentenced to **135 months** |
| Tyler Pranompi Sonesamay | 1/9/20 | i) conspiracy to distrib. 1000 or > marijuana plants | USSG adjusted to 10 yr man/min | 10/13/20 sentenced to **120 months** mandatory min. |
| Tasneef Chowdhury | 1/16/20 | i) conspiracy to distribute 1k or > marijuana plants | 121-151 mos | 11/17/20 sentenced to **121 months** |
| Khalil Yasin | 2/20/20 | i) conspiracy to distrib. & PWID 1kg or > of marijuana | 120-121 mos | 4/20/2021 sentenced to **97 months** *serving state sentence for robbery |
| Abdullah Sayf | 2/20/20 | i) conspiracy to commit kidnapping in aid of racketeering; ii) 924(c) | Restricted USSG on kidnapping 120 mos; 60 mos on 924(c) for a total of 180 mos.<br><br>*USSG restricted bc of statutory maximum | 11/10/20 sentenced to **180 months** |

14

| Fahad Fakrudin Abdulkadir | 2/20/20 | i) conspiracy to commit kidnapping in aid of racketeering; ii) PWID 50kg or < of marijuana; iii) 924(c) | Restricted USSG on cts1-2 is 180 mos; 60 mos on 924(c) for a total of 240 mos. | 11/10/20 sentenced to **192 mos** |
|---|---|---|---|---|
| Kevin Aagesen | 2/27/20 | i) conspiracy to distrib. 1000 or > marijuana plants; ii) conspiracy to kidnap in aid of racketeering | 360 mos - LIFE | 10/20/20 sentenced to **188 months** |
| Soung Park | 3/5/20 | i) conspiracy to distrib. & pwid1000 or > Marijuana plants | 120-135 mos | 10/20/20 sentenced to **132 months** |
| Kyu ("Alex") Wa Hong | 3/9/20 | i) conspiracy to distribute 1000 or > Mj plants | 235-293 mos | 3/23/2021 sentenced to **216 months** |
| David Thai Hoang Nguyen | 3/12/20 | i) conspiracy to distrib. 1kg or > of marijuana | 235-293 mos | 2/10/21 sentenced to **171 months** |
| Anthony Nguyễn Thanh Le | ** 11/23/21 | i) conspiracy to distribute CDS; ii) distribution of cocaine | 87-108 mos | 4/1/22 sentenced to **92 months** |
| Sang Thanh Huynh | 4/1/22 | i) conspiracy to participate in racketeering enterprise; ii) conspiracy to distribute 5 kg or > of cocaine and 1kg or > of marijuana; iii)money laundering; iv) felony in possession of a firearm | 262-327 mos | 7/28/22 sentenced to **192 months** |

15

| | | | | |
|---|---|---|---|---|
| Sascha Amadeus Carlisle | 4/4/22 | i) conspiracy to participate in racketeering activity; ii) conspiracy to engage in kidnapping; iii) conspiracy to distrib. 5 kg or > of cocaine & 1000 kg of marijuana & 1000 marijuana plants | 292-365 mos | 7/29/22 sentenced to **196 months** |

## CONCLUSION

WHEREFORE based on the foregoing reasons and any others that may appear to the Court, Mr. Pak respectfully requests that this Court sentence him to a total sentence of 144 months.

                                                                                                                          Respectfully submitted,
                                                                                                                           Richard Pak
                                                                                                                           By Counsel

_____/s/_____
Joni C. Robin
Virginia Bar No. 44502
Attorney for Richard Pak
Law Office of Joni C. Robin, PLLC
421 King Street, Suite 505
Alexandria, Virginia 22314
Ph: 703-349-1111
Fax: 703-896-3013
joni@jonirobinlaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 2nd day of September, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record in this matter.

_____/s/_____
Joni Robin